IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | Criminal No. 1:01-CR-00237 |
| v. | : | |
| | : | (Judge Kane) |
| KEITH SHEARER | : | (Electronically Filed) |

## SENTENCING MEMORANDUM

AND NOW comes the defendant, Keith Shearer, through his attorney

Thomas A. Thornton of the Federal Public Defender's Office, and files this

Sentencing Memorandum.

## Factual and Procedural History

By superseding information filed March 17, 2004, Keith Shearer was

charged in Count 1 with making false statements, in violation of 18 U.S.C. §

1001(a)(1) and (2) and 18 U.S.C. § 2; and in Count 2 with negligently discharging

pollutants into waters of the United States without a permit, in violation of 33

U.S.C. § 1311(a), 1319(c)(1)(A) and 18 U.S.C. § 2.

On April 13, 2004, Mr. Shearer appeared before this Honorable Court and

entered a plea guilty to the Information.  Sentencing in this matter is scheduled for

April 20, 2005.

<u>**Objections to Presentence Report**</u>

**I. Loss Amount**

Keith Shearer and his father are lifelong grain and livestock farmers who, due to the cyclical and expensive nature of the activity, are constantly required to borrow money, seek grants, and refinance accounts.  Mr. Shearer, as other farmers, depends on the generous programs of the Farms Services Administration (FSA) to keep his farm afloat.  The Farm Services Administration loaned money to Mr. Shearer based on the appraised value of his land, equipment and anticipated farm output.  Mr. Shearer has always had the assets to secure these loans, just as the FSA determined when they initially authorized the loans.  The FSA continues to help Mr. Shearer with grants for his current crops.

Mr. Shearer's assets are more than adequate to cover his loan liabilities to the FSA.  The presentence report does not accurately reflect Mr. Shearer's current asset value.  At the sentencing hearing on March 14, 2005, counsel provided the probation officer with the document which is attached as Exhibit A.  It is a list of Mr. Shearer's assets and their current values.  When these assets are fully considered, there can be no question that there never would have been a loss to the FSA.  The current valuation also secures the creditors who have assumed the FSA positions.

2

The presentence report addendum also is clearly mistaken in their assertion that Mr. Shearer "borrowed" $120,000 from his parents and another $120,000 from Craig Dallmyer "to pay off his [FSA equipment] debts."  Mr. Shearer did not take out loans, he merely found others to assume the FSA's position.  The liens on Mr. Shearer's equipment were assigned to his father and Craig Dallmyer in the same manner that the FSA assigned their liens.  The presentence report's position is inconsistent because it accepts the FSA arrangement, but challenges the equipment assignment.  The presentence report does not offer any verification for the allegation that these assignments of collateral constituted "borrowing."

The assignment of the equipment was not a sham transaction undertaken for the purpose of paying restitution.  Craig Dallmyer is an independent farm investor who took the security position in the equipment as a good investment in an arms-length transaction.  The presentence addendum does not indicate that the allegation of "borrowing" was verified by speaking with Mr. Dallmyer.

Similarly, Mr. Shearer's father undertook investment because the value of equipment exceeds the security interest.  The equipment liens were assigned in this manner after consultation and approval by the bankruptcy court and the FSA.  If the probation office believes that Mr. Shearer's father's interest in the equipment is inappropriate, then another investor can be found to take over the lien.  However, it

3

must be pointed out that the probation office has no support for its allegation that this was somehow an inappropriate transaction which is not fully secured by a value of the equipment.

The presentence report incorrectly advances the conclusion that Mr. Shearer's farm was "mortgaged to the point that the fair market value of the property is less than the required amount needed to satisfy the debt." This is an inaccurate statement. First, it should be noted that the bankruptcy document relied upon by the probation office does not reflect the current value. The bankruptcy documents were filed almost two years ago. Second, the banks which hold the mortgages have accepted the plan through the bankruptcy process because they are fully secured. Third, the value of the land listed in the bankruptcy petition does not include the current value of the ten building lots, one of which just sold for $54,500. There is no indication that the probation office has verified its position by contacting the banks involved. If the banks have been contacted, they could have explained that not only are their positions secured, but that they also have participated in the assignment of the equipment collateral to Mr. Shearer's father.

The position of the probation office cannot survive the application of common sense. It appears that the probation office is unsatisfied because Mr. Shearer did not sell all of the equipment at auction for fire sale prices. A sale of the equipment would make no sense. Mr. Shearer is a farmer, his loans for next

year are secured by next year's crops.  If he sold all of his equipment, then he would have to buy all the equipment back again.  He would be unable to farm to pay off the loan for the coming year.  Then, after buying someone else's equipment, he would owe more money than the equipment lien under which his is currently struggling.  As anyone who has replaced an item knows, it always costs more to replace what you had.  Common sense dictates against the position of the probation office.

**A.  Application Notes**

The presentence report addendum correctly notes the refinement of the application notes relevant to this inquiry as a result of the 2001 amendments to the United States Sentencing Guidelines.  The note to new Section 2B1.1 seems to be more of a clarification than a change in philosophy regarding the loss amounts in loan cases.  The presentence report has used the 2000 edition of the Sentencing Guidelines because of *ex post facto* concerns.  The Court's ruling in this matter may change that opinion and it may be necessary to recalculate the guidelines under the 2004 edition.

The application notes to the 2004 guidelines direct a decision in Mr. Shearer's favor.  The comment gives credit against loss for "...the amount the victim has received at sentencing for the disposition of collateral." (Note (2)(E)(ii)).  The victim herein, the FSA, has completely "recovered" the total

5

amount of the loan due to the "disposition of the collateral." A plain reading of the new note shows that the loss amount should be $0. A plain reading of the old note to § 2F1.1 brings the same conclusion as the FSA has fully recovered "...from any assets pledged to the loan."

**B. Case Law**

The vast majority of *juris prudence* in this area interprets old guideline Section 2F1.1. Since the 2000 amendments appear to only clarify, not change, the note in question, it seems prudent to discuss those cases.

The Third Circuit in *United States v. Mummert*, 34 F.3d 201 (3d Cir. 1994) found that loss is "...the actual loss to the bank at the time of sentencing." 34 F.3d at 203. In the matter of Mr. Shearer, the FSA, the bank herein, has a $0 loss. The facts of Mummert present an actual example of the allegation that the probation office is making herein against Mr. Shearer. In Mummert, the defendant falsified, or perhaps never filled out, a loan application to a friendly bank. The loan was not collateralized nor secured at all. When the fraud was discovered, Mummert offered to pay back the loan by selling the house he had built with the loan proceeds.

The Third Circuit rejected Mummert's claim that he could sell the house to reduce the amount loss to $0 because, "a defendant should not be able to reduce the amount of the loss for sentencing purposes by offering to

6

make restitution after being caught." 34 F.3d at 203. Mr. Shearer is not

making restitution after being caught. The FSA loaned the money on

specific assets owned by Mr. Shearer. The loans were called due because of

the instant prosecution. The exact collateral pledged to the loan was legally

"disposed" of under the guidance of the FSA and the bankruptcy court. Mr.

Shearer did not sell some other unencumbered or unrelated asset to make

restitution. He did not fraudulently obtain the loan, he merely misused

grain, a portion of the assets which were properly valued, during the

pendency of the loan.

Other circuits have also interpreted the old guideline Section 2F1.1.

The Seventh Circuit has held that loss is "...the unsecured portion of a loan"

at the time the offense was discovered. *United States v. Downs*, 123 F.3d

637, 643 (7th Cir 1997). At the time of the "discovery" of Keith Shearer's

offense, the loan was entirely secured. Mr. Shearer has proved this by

completely repaying the loan using the assets pledged as security. The

assets could have been sold more quickly if not for the necessities of the

bankruptcy court and the FSA. In *United States v. Downs*, 123 F.3d 637 (7th

Cir. 1997) the court held, "...the unsecured portion of a loan is a common

sense estimate of the interim risk faced by the lending institution and gives a

defendant credit for the pledged assets the lending institution could readily

use for recompense." "This estimate of loss similarly has the advantage of not making the term of a criminal sentence turn on conjecture." 123 F.3d at 643-44, quoting *United States v. Mount*, 966 F.2d 262, 267 (7th Cir. 1992). Mr. Shearer's loan is fully secured.

The Eighth Circuit determined that the loss amount is the amount of the loan which is outstanding at the time of the defendant's arrest for which no assets were pledged as security. *United States v. Jindra*, 7 F.3d 113, 113-114 (8th Cir. 1993). Mr. Shearer's assets were pledged as security and the value of those assets satisfied the outstanding debt. The Eleventh Circuit also adopted a loss calculation which represented the difference between the value of the collateral and the value of the loan. *United States v. Menichino*, 989 F.2d 438, 441-42 (11th Cir. 1993).

Unlike many of the reported cases, Keith Shearer did not obtain the loan fraudulently. He did not overvalue his assets, misrepresent his assets, nor did he lie on the loan application form. The assets were approved and valued by the FSA, and Mr. Shearer did not, in any way, fraudulently induce the loan.

Mr. Shearer merely mishandled some of the grain which was pledged to the FSA. Such an action does not support the probation office's interpretation of loss amounts.

**II.     Other Objections**

The addendum to the presentence report was provided to counsel on March 14, 2005, the date previously set for sentencing.  As a result of the loss position adopted by the probation office, counsel feels obligated to enter several other objections in an effort to place Mr. Shearer in a range where he can ask for probation.

**A.     Acceptance of Responsibility**

The presentence report has denied Mr. Shearer a third point for acceptance of responsibility in a timely fashion.  The presentence report has thereby invaded a province specific to the government.  The current guidelines leave that third point completely within the discretion of the government.  In this matter, the government is bound to recommend that third point by the plea agreement.  If the probation office is claiming the authority to deny the points as a result of the application of the old guidelines, then it is also inappropriate.  Mr. Shearer did not delay trial in any way.  The government did not have to prepare for trial.  As this Court knows, there was never a jury empaneled nor even considered in this matter.  The probation office has mistaken plea negotiations for a reason to deny the third point for acceptance of responsibility.

This matter, including both the financial and environmental concerns, was very difficult to resolve. It took counsel a significant amount of time to acclimate himself to the areas involved. It is wrong to deny Mr. Shearer as he tried to simultaneously appease the FSA, the bankruptcy court, and the United States Attorney. The probation office has no support for this denial of acceptance.

**B.    More Than Minimal Planning**

The presentence report has enhanced Mr. Shearer's sentence by two levels for "more than minimal planning." If this case were sentenced under the 2004 guidelines, then there would be no question that he did not engage in "sophisticated means." However, the old guidelines allow for a more loose interpretation under the guise of "more than minimal planning."

Still, Mr. Shearer objects to the presentence conclusion that he was involved in more than minimal planning. The counts to which he pled guilty involve the improper disposition of grain. The only reason Mr. Shearer sold the grain was to pay other debts which were coming immediately due. This did not require anything more than minimal planning.

Grain grows. Debts mount. Bills come due. Cattle need feeding, and the grain is ready to be harvested. That is the full extent of the planning involved in Mr. Shearer's sales of grain in this indictment. Certainly this

10

was not a sophisticated plan.  It was merely opportune.  If the grain had not been ready to harvest, Mr. Shearer would have been required to find some other way to pay the debt which occasioned each sale of grain.  Each occasion involved no more planning than Mr. Shearer receiving a bill and thinking to himself, "What am I going to do?"  The enhancement should be removed.

**C.    Criminal History II Overstates the Seriousness of Mr. Shearer's Prior Record**

The probation office has awarded a criminal history point for the harassment conviction in paragraph 48.  Even a single criminal history point overstates the seriousness of this offense.  Mr. Shearer and his fiancé, Tonya Rhineer, were having an argument in the farmhouse.  Mr. Shearer was drinking a glass of water.  He threw the water from the glass, not the glass, at Ms. Rhineer.  She got wet.  Out of anger, she called the local police department.  Mr. Shearer did not throw "large amounts of cold water."  He threw a single glass.

The couple was still arguing when the police arrived, and Mr. Shearer was charged with harassment.  Due to the fact that Mr. Shearer felt very remorseful and sorry for his actions, he immediately paid the fine to put the incident behind them.  Ms. Rhineer continues to live with Mr. Shearer in the farmhouse and will testify regarding this incident at sentencing.

The presentence report has also placed a single point in Mr. Shearer's criminal history for "pollution of waters." While Mr. Shearer readily accepts culpability for these actions, he believes that the presentence report has overstated some of the consequences. Mr. Shearer will testify and provide documentary evidence at sentencing to support this objection. In essence, Mr. Shearer's testimony will show that after the two incidents in 1998, he did his best to avoid any other contamination of the creek. The incident for which Mr. Shearer pled guilty in this matter was not intentional. The conditions of the field, due to a drought, and the application caused a situation where Mr. Shearer did not properly supervise the runoff and recklessly allowed contamination to enter the creek.

Mr. Shearer had been spreading manure on his fields for years. Since this incident, he has decided to stop spreading the manure that got him into this difficulty.

Pennsylvania requires a Nutrition Management plan for any field upon which this type of manure is to be spread. The plan must be put together by the producers of the manure and authorized by the Pennsylvania Department of Environmental Protection. Each plan is accompanied by a chart which tells the farmer how much he can spread on particular types of fields and how often. The Nutrition Management Plan must be updated each year.

Mr. Shearer spread manure and candy water (water from cleaning candy making equipment) for Donald Hershey. At the time of the 1998 violation, Mr. Shearer was only spreading manure. The Nutrition Management Plan provided to Mr. Shearer by the manure producer, Hershey, is attached as Exhibit B. The chart Mr. Shearer followed to spread the manure in 1998 is attached as Exhibit C. Mr. Shearer followed the chart as he applied less than 18,000 gallons per acre each day for a corn crop on a wheat stubble field. Unfortunately, it turned out that Mr. Shearer, had followed the wrong chart and accepts the consequences for this reckless and negligent action. Mr. Shearer readily admits that he should have done a better job at supervising the application of the manure and preventing it from flowing into the creek.

The 2003 incident resulted from the cows Mr. Shearer keeps on his farm. The stream in question is barely a trickle in the summer. The cows, and other livestock, used the pasture area surrounding the stream and their manure was put on the fields. Mr. Shearer did not efficiently manage their byproducts. As Mr. Shearer is most certainly subject to intense scrutiny by DEP, the Court can be assured that he is doing his best to stop any repeat violations.

Mr. Shearer readily accepts his failure of judgment. However, he asks the Court to consider the six years which passed to the current incident, which indicates that he has made significant improvements since the 1998 incident.

### D.     Departure for Farm and Personal Responsibilities

Mr. Shearer runs a large farming operation with Tonya Rhineer. She will testify that she does all the inside work; bookkeeping, ordering, sales verification, and other tasks. Mr. Shearer does all the outside farm work with the livestock and crops. Mr. Shearer also hires and supervises the day labor employees who plant, weed, fertilize, and harvest. Mr. Shearer operates the combines, plows and other heavy equipment necessary to run the farm.

It would not be possible to sustain the farm without Mr. Shearer. He and Tonya do not make enough money from the farm to be able to hire people to do the jobs accomplished every day by Keith Shearer. His presence on the farm is vital. Without Mr. Shearer's sweat equity, as with most farmers, the farm would have to be sold.

## Conclusion

Keith Shearer respectfully requests that the Court hold a hearing on all of the objections noted in this memorandum and thereafter grant him probation.


Respectfully submitted,

Date:   March 28, 2005          /s/ Thomas A. Thornton
                                THOMAS A. THORNTON, ESQUIRE
                                Asst. Federal Public Defender
                                Attorney ID #PA44208
                                100 Chestnut Street, Suite 306
                                Harrisburg, PA 17101
                                Tel No: (717) 782-2237
                                Fax No: (717) 782-3881
                                <thomas_thornton@fd.org>
                                *Attorney for Keith Shearer*

15

# CERTIFICATE OF SERVICE

I, Thomas A. Thornton of the Federal Public Defender's Office, do hereby certify that I served the foregoing **SENTENCING MEMORANDUM,** via Electronic Case Filing, or by placing a copy in the United States mail, first classes in Harrisburg, Pennsylvania, addressed to the following:

MARTIN C. CARLSON, ESQUIRE
United States Attorney's Office



KEITH SHEARER

Date:   March 28, 2005            /s/ Thomas A. Thornton
THOMAS A. THORNTON, ESQUIRE
Asst. Federal Public Defender
Attorney ID #PA44208
100 Chestnut Street, Suite 306
Harrisburg, PA 17101
Tel No: (717) 782-2237
Fax No: (717) 782-3881
<thomas_thornton@fd.org>
*Attorney for Keith Shearer*

16